STATE of Tennessee, Appellee,

v.

Anthony Darrell Dugard
HINES, Appellant.

Supreme Court of Tennessee,
at Nashville.

Sept. 6, 1988.

W.J. Michael Cody, Atty. Gen. & Reporter, Kymberly Lynn Anne Hattaway, Asst. Atty. Gen., Nashville, J. Kenneth Atkins, Dist. Atty. Gen., James W. Kirby, Asst. Dist. Atty. Gen., Charlotte, for appellee.

Steve Stack, William G. Wilkinson, Ashland City, for appellant.

## OPINION

O'BRIEN, Justice.

The defendant was convicted of murder in the first degree for the killing of Mrs. Katherine Jean Jenkins and has been sentenced to death by electrocution. In imposing sentence the jury found in accordance with T.C.A. § 39–2–203 that the following aggravating circumstances existed:

(1) Defendant had been previously convicted of one or more felonies, other than the conviction charge, which involved the use or threat of violence to the person.

(2) The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind.

(3) The murder was committed while defendant was engaged in committing a statutorily listed felony.

Among the issues raised on this appeal is the assertion that the State's case was based wholly on circumstantial evidence which was insufficient to support the conviction. In argument defendant concedes the proof was sufficient to support a verdict of first degree murder but he insists it fails to establish beyond a reasonable doubt that the offense was committed by him to the exclusion of all others.

Between 1:00 and 1:30 p.m. on 3 March 1985 the body of Katherine Jean Jenkins was discovered wrapped in a sheet in Room 21 of the CeBon Motel off Interstate 40 at Kingston Springs. The victim was a maid at the motel and had been in the process of cleaning the room when she was killed. Her outer clothing had been pulled up to her breasts. Her panties had been cut or torn in two pieces and were found in another area of the room. A $20 bill had been placed under the wrist band of her watch.

The cause of death was multiple stab wounds to the chest. Four deep, penetrating wounds, ranging from 2.5 inches to 6.4 inches in depth, had been inflicted about the victim's chest with a knife similar to a butcher knife or a hunting knife. Other superficial cuts were found in the area of the neck and clavicle. There was also a knife wound which penetrated through the upper portion of the vagina into the mesentery in the lower part of the abdominal cavity. Dr. Charles Harlan who performed the autopsy on the victim's body testified that in view of the small amount of blood in the vaginal vault it was his opinion the wound occurred at or about the time of death. The victim also had what he described as "defensive wounds" on her hands and arms.

Jenkins had been left in charge of the motel at about 9:30 a.m. At that time the occupants of Rooms 9, 21 and 24 had not yet checked out. When the manager left her in charge she was given a Cheatham County State Bank bag containing $100 in small bills to make change for motel guests as they paid. The bank bag, bloody and empty, was discovered in the room with her body. It was her established habit to lock her automobile at all times and to keep her keys and billfold on her person when she worked. Her car keys, billfold and her 1980 silver-colored Volvo were missing.

On 1 March 1985 defendant had departed by bus from Raleigh, North Carolina. He had been given a non-refundable ticket to

Bowling Green, Kentucky and $20 in spending money. The traveling time from Raleigh, North Carolina to Nashville, Tennessee was approximately 17 hours. Prior to his departure he was observed by a witness to be carrying a hunting knife in a sheath which was concealed beneath his shirt. The witness admonished him that he could not carry a knife like that on the bus to which he responded "I never go anywhere naked." "I always have my blade." Sometime in the early morning hours of 3 March 1985 he checked in and was assigned to Room 9 at the CeBon Motel. He was wearing a green army-type fatigue jacket, fatigue pants and boots. He was next seen at approximately 9:30 a.m. walking in a direction from his room toward a drink machine. At that time he told the manager he was not yet ready to check out. He was also seen sometime prior to 9:30 purchasing a sandwich at a deli-restaurant across the street from the motel. The same witness who saw defendant also saw another stranger there somewhere between 1:30 and 2:30 who she described as taller than defendant with dark hair, kinky looking and wild-eyed. He departed the restaurant in the general direction of the CeBon Motel. The Cehatham County Sheriff testified that he responded to a call to the CeBon Motel at 2:37 p.m. When he arrived on the scene blood spots in the room were beginning to dry and the body was beginning to stiffen. Defendant was seen between 11:00 and 11:30 a.m. walking from the direction of the Interstate toward the CeBon Motel. At 12:40 p.m. a witness saw the victim's Volvo automobile pulling out from the CeBon Motel driveway. It was being operated by a person who appeared to be a man with very short, light colored hair. The vehicle crossed over the Interstate and turned east on Interstate 40. She followed behind and endeavored to catch up but it sped off toward Nashville at a high rate of speed. Defendant was next identified in possession of the car a few miles past Gallatin on Interstate 65, heading in the direction of Bowling Green, Kentucky. A group of young people first endeavored to help him start the stalled automobile and then gave him a ride to Bowling Green. During the trip to Bowling Green one of these witnesses observed some dried blood on the right shoulder of his shirt. He carried a jacket which he kept folded. After he arrived at his sister's home in Bowling Green defendant told her he had endeavored to pay another day's rent at a motel when he was attacked by the motel operator. He demonstrated to her how he had stabbed the man. He also related to her he had a sum of money. She could not remember whether he said $35,000 or $3,500. Defendant also told his sister's husband he had earned approximately $7,000 working as a mechanic in North Carolina. He displayed a set of keys to a Volvo automobile and explained that a man who had given him a ride attempted to rob him. Defendant purportedly grabbed the steering wheel and when the car ran off the road he grabbed the keys and ran. According to the witness he was wearing an army fatigue jacket which had something large, heavy and bulky in the pocket. The witness had previously seen defendant with a survival knife with a 6½ to 7 inch blade hanging from his belt. When defendant was taken into custody he volunteered the statement that he had taken the woman's car but had not killed her. According to the arresting officer he had not advised the defendant that a woman had been killed prior to the volunteered statement. There was evidence however that defendant was aware he had been charged in Tennessee on a murder warrant. The victim's wallet was found wrapped in a thermal underwear shirt a short distance from where her car was found abandoned. The key to Room 9 of the CeBon Motel was found at the site where defendant had been camping out near Cave City, Kentucky. When asked by a TBI agent to tell the truth about the death of Katherine Jenkins defendant stated that if the officer could guarantee him the death penalty he would confess and tell him all about the murder and that he could tell him everything he wanted to know if he was of a mind to. There were marks on the wall of Room 9 at the CeBon Motel apparently made by someone stabbing a knife into the wall. When shown photographs of the marks on the

wall defendant responded that they were knife marks. These marks were obviously made by a knife larger than two taken from defendant at the time of his arrest.

There is additional evidence in the record incriminating defendant. That summarized above establishes guilt of the conviction offense. A criminal offense may be established exclusively by circumstantial evidence and the record in this case is abundantly sufficient for a rational trier of fact to find defendant's guilt beyond a reasonable doubt.

■ Defendant protests the introduction into evidence of statements made by him to the authorities to the effect that he would kill a guard if sentenced to life in prison and that he wanted a promise of the death penalty. It is his insistence that the admission of this evidence removed from the sentencing determination the reliability required by the Eighth Amendment. He says these comments had no bearing on any fact of consequence in determining if he was guilty of the homicide and did not apply to any statutory aggravating circumstances related to sentencing. He relies on *State v. Banks*, 564 S.W.2d 947 (Tenn.1978) for the inadmissibility of such evidence. He concedes that the statements made by him to the effect that he would or could tell them all about the homicide were relevant because they raised a reasonable inference he knew of the facts and circumstances of the murder and was in some way involved with it.

Analysis of the evidence objected to leads to a contrary conclusion. Looking to the admissibility of the evidence, there is a clear inference that he would not have been concerned about the imposition of the death penalty or life imprisonment if he had simply committed the larceny of the automobile. The statements complained of were admitted at the guilt phase of the proceedings. There was no contemporaneous objection to the admission of this testimony and the record indicates that at least part of this evidence was drawn out for a second time on cross-examination. Moreover, this issue was not raised in defendant's motion for new trial. When no objection to

testimony is interposed it may properly be considered and given its natural probative effect as if it were in law admissible. *State v. Harrington*, 627 S.W.2d 345 (Tenn.1981). The issue is without merit.

Defendant poses an issue complaining of various purported improper arguments made by the State which he says was with the apparent purpose to inflame the jury against him. He refers to the State's argument regarding his statement that he wanted the death sentence and that his statements to his sister were a twisted confession of murder. He argues that the Attorney General misstated the facts and made statements based upon his own personal knowledge rather than facts in evidence.

■ Here too, we find that defendant failed to make any contemporaneous objection to the allegedly improper argument. The record further reflects that he failed to preserve these complaints in his motion for new trial. Moreover, we do not find fault with the first part of the argument complained of. In reference to his statements to his sister, the Attorney General argued "that defendant would not admit to his sister he had killed a woman; he told her I killed a guy at a motel and robbed him." There is no question that he did tell his sister he stabbed a man at the motel and he also told her that he had a large sum of money. The trial judge admonished the jury to rely on their own recollection of the testimony and under the circumstances we do not find the Attorney General's comments to be the distorted misstatement of the testimony suggested in defendant's brief.

■ We do not approve of the District Attorney's statement, "that presumption of innocence is gone because we have shown you the proof to connect him and show he committed the murder. There is no presumption of innocence anymore. We removed his presumption of innocence by the proof and you know that's true." This Court said in *State v. Duncan*, 698 S.W.2d 63, 70 (Tenn. 1985), "On its face this seems a misstatement of the position in Tennessee that the presumption of innocence remains with the defendant up until the verdict."

**520**

(Citations omitted). However it becomes plain from reading the record that it was not the intent of the Attorney General to misstate the law. It is obvious he was carried away by his own rhetoric and in light of the failure of defense counsel to object coupled with the correct instruction by the court to the jury on the presumption of innocence, this statement was not plain error, nor in our opinion did it materially effect the verdict of the jury. *State v. Duncan,* supra.

Defendant has also raised an issue in reference to the argument of the State at the penalty phase of the proceedings. He says that argument was improper and inflammatory and encouraged the jury to consider defendant's statement that he would kill a guard if given a life sentence. He also complains that the District Attorney General characterized a life sentence as a reward rather than a penalty which he says is not supported by the record and is a mischaracterization which accrued to his prejudice. There is also an objection on the premise that the District Attorney General injected the matter of parole into his argument and argued that the jury would be recreant in its duty to society if the death sentence was not imposed.

Most of the objections to the State's argument are made in isolated context which, when considered in view of the argument as a whole, gives them an exaggerated significance. Once again, we observe there was no contemporaneous objection at trial to any of the statements which are now raised here as grounds for error. We do find one or two of these grounds asserted in the motion for new trial, contrary to the State's insistence.

■ We agree that defendant's remark to the police officers that he would kill a prison guard if sentenced to life was inappropriate as a sentencing consideration. However it was a matter which had been properly placed in evidence before the jury at the guilt phase of the proceeding and if the comments of State's counsel were improper, they could not have affected the jury's verdict at the sentencing phase of the trial. Defense counsel made an impassioned plea against the death penalty in which he dwelt at length on the vicissitudes of a life sentence. The District Attorney's argument in that phase of his closing remarks was in direct response to the defense argument and did not exceed the reasonable latitude allowed to counsel in arguing their respective positions.

■ It is difficult to tell where the District Attorney General was going in argument when he commented that defendant had been on parole. It was apparent that he was referring to defendant's prior conviction, as was defense counsel when he mentioned in argument that defendant had been on parole from Kentucky. Had he gone on to mention parole possibilities for defendant in this proceeding he certainly would have been treading on forbidden ground. See *Smith v. State,* 527 S.W.2d 737, 738 (Tenn.1975). However he was prevented from proceeding in that direction by the admonishment of the court to stay away from the subject of parole and we cannot see how the comments which were made could have adversely impacted upon the jury's determination as to sentencing.

■ The District Attorney General made some fanciful analogy to the frenzied conduct of wild cattle in a herd when exposed to the attack of a carnivore, and also called on the jury to do as he and the people of Tennessee asked them to do in following what the law called for in the case. We do not agree with the defense contention that the implication of these remarks was that the jury's responsibility was to impose the death sentence and not to weigh the aggravating and mitigating circumstances based on the evidence. The contested argument did no more than articulate the prosecutor's intent that the jury return a death sentence in accordance with the law and their oath.

■ Defendant complains of other comments of the State's counsel to the effect that defendant had bragged about a murder and that he had killed someone and got a lot of money and words to the effect that some people get a high or are exhilarated by killing and will go brag about it. This

was unquestionably a misstatement of the evidence. These comments in argument were not objected to when made and seem to be legitimate inferences to be drawn from the proof which the jury heard and certainly did not effect the outcome of the sentencing hearing. *State v. Cone,* 665 S.W.2d 87, 94 (Tenn.1984).

It is insisted the death penalty cannot stand because the trial judge failed to fully instruct the jury on the aggravating circumstances of "committing a felony," "torture and depravity of mind" as required by law. In *State v. Williams,* 690 S.W.2d 517 (Tenn.1985), this Court mandated that at a capital sentencing proceeding a jury must be instructed as to the statutory definition of any felony relied upon by the State as an aggravating circumstance under T.C.A. § 39–2–203(i)(7)[1] and that a jury must be fully instructed as to the meaning of the terms "heinous," "atrocious," "cruel," "torture," or "depravity of mind" as those words are used in the aggravating circumstance set forth in T.C.A. § 39–2–203(i)(5).[2] This Court concluded that

> [u]nless a jury is instructed as required ..., its imposition of the death penalty cannot stand.

> \*   \*   \*   \*   \*   \*

> ... Without such instructions we have a "basically uninstructed jury," as stated by the Supreme Court in *Godfrey [v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) ]. Such a jury cannot lawfully impose the death penalty.

690 S.W.2d at 533.[3]

▆▆▆ In the present case, which was tried eight months after the decision in *Williams* was released, the State relied upon four aggravating circumstances and the jury was instructed as follows:

> (1) The defendant was previously convicted of one or more felonies, other than the present charge, which involved the use or threat of violence to the person. [§ 39–2–203(i)(2) ]

> (2) The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. [§ 39–2–203(i)(5) ]

> (3) The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any rape, robbery or larceny. [§ 39–2–203(i)(7) ]

> (4) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another. [§ 39–2–203(i)(6) ]

The jury returned a verdict unanimously finding the first three listed aggravating circumstances and that the punishment should be death.

It is clear that the trial court's instruction was inadequate under *Williams.* First of all, the court's instructions did not include any definition of the terms "heinous," "atrocious," "cruel," "torture" or "depravity of mind." Second, the court failed to define at sentencing any of the three felonies relied upon by the State in establishing the third aggravating circumstance.

---

1. T.C.A. § 39–2–302(i)(7) reads:

   The murder was committed while the defendant was engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb;

2. T.C.A. § 39–2–203(i)(5) reads:

   The murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind;

3. See also the recent decision of *Maynard v. Cartwright,* —— U.S. ——, ——, 108 S.Ct. 1853, 1858, 100 L.Ed.2d 372 (1988), wherein the Court noted that Eighth Amendment claims "characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)."

■ Such failures have not always proven reversible error in the decisions this Court has rendered after *Williams*. For example, *State v. Claybrook*, 736 S.W.2d 95 (Tenn.1987); *State v. King*, 718 S.W.2d 241 (Tenn.1986); *State v. O'Guinn*, 709 S.W.2d 561 (Tenn.1986); and *State v. Duncan*, 698 S.W.2d 63 (1985), were all cases in which the trial court failed to define the terms used in T.C.A. § 39-2-203(i)(5) and in which this Court found no reversible error since the evidence clearly supported this aggravating circumstance and the other aggravating circumstances found by the jury were correctly charged and supported by the evidence. A crucial factor in all these cases, however, was that in each the trial had occurred before *Williams*, and this Court had held that the instructional requirement in *Williams* was not retroactive. *State v. O'Guinn, supra*, 709 S.W.2d at 568. This was consistent with this Court's prior holding, reiterated in *Williams* itself, 690 S.W.2d at 533, that the aggravating circumstance set out in T.C.A. § 39-2-203(i)(5) was not unconstitutionally vague and overbroad under *Godfrey v. Georgia. See, e.g., State v. Melson*, 638 S.W.2d 342, 367 (Tenn.1982); *State v. Pritchett*, 621 S.W.2d 127, 137-139 (Tenn. 1981); *State v. Groseclose*, 615 S.W.2d 142, 151 (Tenn.1981). In these earlier decisions this Court thoroughly reviewed the evidence to assure that it supported the jury's finding as to this aggravating circumstance. It is also notable that in *Claybrook, Duncan* and *O'Guinn*, the defendant had not objected to the pre-*Williams* instruction and that in *King, supra* the defendant had only sought an instruction as to the definition of "torture".

In *State v. Porterfield*, 746 S.W.2d 441, 451 (Tenn.1988), a case, like the present one, tried eight months after the *Williams* decision was released, this Court found that the defendant was not prejudiced by the trial court's failure to give the definitions of the terms "heinous," "atrocious," and "cruel" exactly as set out in *Williams* or to define "torture" or "depravity of mind" for the jury. After examining the definitions that the trial court had given, this Court stated:

> It would have been better had the trial judge used the definitions set out in *State v. Williams*, 690 S.W.2d 517, 533 (Tenn.1985), as they have been approved by this court. However, the definitions given were in our opinion adequate. Further, we find no prejudicial error in the trial court's failure to define the terms "torture" or "depravity of mind." The evidence in this case supports the aggravating circumstance, Tenn. Code Ann., § 39-2-203(i)(5), as defined in *State v. Williams, supra*, as the defendant repeatedly struck the victim with a tire iron, inflicting horrible head wounds. Furthermore, the remaining two aggravating circumstances were correctly charged and are supported by the evidence.

746 S.W.2d at 451.

In *State v. Carter*, 714 S.W.2d 241 (Tenn. 1986), this Court also did not find harmful error in the trial court's failure to instruct the jury properly under *Williams* on the aggravating circumstance in T.C.A. § 39-2-203(i)(7). The trial in *Carter* had occurred in November 1984. While this was before *Williams* was released, it was after this Court's directive in *State v. Moore*, 614 S.W.2d 348, 350-351 (Tenn. 1981), that trial judges "should regularly" include in their instructions to the jury the statutory definition of any felony relied on by the State as an aggravating circumstance. The Court noted that

> We recently held in *State v. Williams*, 690 S.W.2d 517 (Tenn.1985), that it was error to fail to give the statutory definition of the felonies which the jury was asked to consider in determining whether it should find the existence of the aggravating circumstance defined in T.C.A. § 39-2-203(i)(7). The felony involved in *Williams* was robbery and the opinion is silent as to whether the statutory definition of robbery was given during the guilt phase.
>
> In this case the jury had been given the statutory definition of larceny, robbery and kidnapping the day before they retired at 9:37 a.m. to consider the punishment. We think it is significant that

they eliminated robbery from their finding of aggravated circumstances under T.C.A. § 39–2–203(i)(7). The definition of that crime includes the element of forcible taking from the person of the victim. The proof in this case was that the victim's wallet was found on his person with cash undisturbed and in addition cash was found clipped to a clipboard in the seat of the pick-up truck. Price testified that defendant took nothing from the person of Lile after killing him and before throwing him over the cliff. This demonstrates that the jury had clearly in mind the elements necessary to convict of the crime of the felony of robbery and quite properly declined to include it. It was patently obvious that defendant was guilty of the larceny of Lile's truck and kidnapping him from the Interstate 81 rest stop. We find this situation distinguishable from *Williams* and harmless. 714 S.W.2d at 250.

The present case is distinguishable from these earlier cases. First, and most obviously, the trial occurred several months after the *Williams* rule was announced. This Court's decisions in *Duncan, O'Guinn, King,* and *Claybrook* are thus inapposite in the present case. Unlike in *Porterfield* and *Carter,* the trial court here has erred in failing to instruct the jury fully on both the aggravating circumstances involved in *Williams.* Also unlike *Porterfield,* where two of the three aggravating circumstances were correctly charged, here there was plain error patently contradictory to this Court's clear mandate in *Williams* in charging two of the three aggravating circumstances found. Such cumulative error injects an undue degree of unreliability into the sentencing procedure where the jury must weigh all aggravating and mitigating factors. *See State v. Pritchett, supra,* 621 S.W.2d at 139; *State v. Moore, supra,* 614 S.W.2d at 352. *Compare State v. Laney,* 654 S.W.2d 383, 388 (Tenn.1983). In *Porterfield* the defendant presented no proof as to mitigating circumstances.

In *Williams* the Court also made it clear that the evil it sought to avoid by mandating these instructions was that of "a basically uninstructed jury" and the attending risk of arbitrary and capricious sentencing. *See also State v. Laney, supra,* 654 S.W.2d at 388 ("The absence of proper legal guidance [at capital sentencing] invites ... a certain degree of capriciousness in the deliberation.") In *Porterfield* the trial court had adequately instructed the jury as to the most ambiguous terms in T.C.A. § 39–2–203(i)(5). In *Carter* the jury had been instructed at the guilt hearing as to the elements of the felonies relied upon by the State; and its verdict, selectively omitting certain of these felonies, revealed that, contrary to being uninstructed, the jury "had clearly in mind the elements necessary to convict" on one of these felonies. In the present case there was neither substantial compliance with *Williams* nor a verdict clearly showing that the jury understood the elements of the felonies it found supporting T.C.A. § 39–2–203(i)(7). Also, unlike *Carter,* only one of the felonies found by the jury had been instructed at the guilt hearing. The jury was thus never told the legal definition of larceny and rape, two offenses even those trained in the law may at time have difficulty defining. *See, e.g., State v. Brobeck,* 751 S.W. 2d 828 (Tenn.1988) (addressing the issue of whether a dead person may be raped, a factual issue raised by the proof in the present case).

Again, it may be pointed out that the juries in other cases where the Court has not found reversible error under *Williams* had also been correctly instructed as to all other aggravating circumstances involved. In the present case the jury was correctly instructed only as to one of the aggravating circumstances it found.

On the other hand, this case is distinguishable from *Williams* by the fact that the evidence here fully supports the aggravating circumstances found by the jury. In *Williams* the proof did not support the aggravating circumstance in T.C.A. § 39–2–203(i)(5) and two of the three felonies found by the jury under T.C.A. § 39–2–203(i)(7). Furthermore, there is no mention in *Williams* of whether the jury was ever instructed at the guilt phase as to

the felonies found by the jury at sentencing. The jury in the present case was, as noted earlier, instructed only on the elements of robbery at the guilt phase. In *Williams* also both aggravating circumstances found by the jury were incorrectly instructed. Here one of the three aggravating circumstances found was correctly instructed. Thus in *Williams* there was no valid aggravating circumstance upon which a sentence of death could be based.

■■■■ Although language in *Williams* at first suggests that any failure to comply with its holding cannot be considered harmless, *Porterfield* reveals that this Court has not taken this approach. To the extent that the failure to give the instruction mandated by *Williams* is constitutional error in that it results in the "standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury," 690 S.W.2d at 532 quoting *Godfrey v. Georgia, supra,* 100 S.Ct. at 1765, the standard for determining harmless error is whether the error committed is harmless beyond a reasonable doubt. *Satterwhite v. Texas,* — U.S. —, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284 (1988); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *see also People v. Odle,* 45 Cal.3d 386, 247 Cal.Rptr. 137, 151–155, 754 P.2d 184, 197–201 (1988) (discussing the harmless error doctrine as applied to instructional error in capital sentencing and anticipating the rule that the United States Supreme Court will adopt). Despite the strong proof of the aggravating circumstances shown here, it is difficult to say that this standard has been met. To the extent that the rule in *Williams* is procedural, mandated by this Court acting in its supervisory capacity to assure objective and reliable sentencing in capital cases, it is difficult to ignore the obvious failure of the trial court to follow the clear commands of this Court;[4] nor can it be said, where as here there was evidence of both aggravating and mitigating circumstances,

that the defendant clearly was not prejudiced by leaving the jury uninstructed, particularly as to the felonies of rape and larceny.

We are of the opinion that this case should be remanded for two reasons. First, the jury did find two felonies supporting the death penalty, the elements of which it had no way of knowing. This indicates a degree of "sheer speculation" and unguided discretion prohibited by *Godfrey v. Georgia, supra,* and Eighth Amendment jurisprudence. As the United States Supreme Court has stated in the recent case of *Mills v. Maryland,* — U.S. —, — n. 10, 108 S.Ct. 1860, 1867 n. 10, 100 L.Ed.2d 384 (1988), "While juries indeed may be capable of understanding the issues posed in capital-sentencing proceedings, they must first be properly instructed." The jury here was not properly instructed. Second, this case represents a clear and inexcusable violation of *Williams.* We cannot say that the error committed is harmless beyond a reasonable doubt. Accordingly, the judgment of the trial judge sustaining the defendant's conviction of first degree murder is affirmed but the verdict and sentence imposing the death penalty is set aside and this cause is remanded to the trial court for a new trial respecting the imposition of punishment only.

A report will be submitted by the trial judge in compliance with Supreme Court Rule 12.

HARBISON, C.J., and FONES, COOPER, and DROWOTA, JJ., concur.

---

**4.** In the present case the defendant did not object to the trial court's failure to charge as required in *Williams* and did not call this error to the judge's attention. Such failure may be a factor in considering whether reversible error

has occurred but is not always fatal to appellate review in cases where the defendant is under sentence of death. *See State v. Duncan, supra,* 698 S.W.2d at 67–68.